## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

**CHERYL M. CORBETT,**

      **Plaintiff,**

      **v.**                     **Civil Action No. 08-10904**

**TEXAS INSTRUMENTS, INC.,**

      **Defendant.**

_____
_____

**SANDRA J. HANNAN,**

      **Plaintiff,**

      **v.**                     **Civil Action No. 08-10905**

**TEXAS INSTRUMENTS, INC.,**

      **Defendant.**

_____

**DEFENDANT TEXAS INSTRUMENTS INCORPORATED'S MEMORANDUM IN
SUPPORT OF ITS MOTION TO EXCLUDE PROFFERED EXPERT BRUCE
MOLHOLT UNDER *DAUBERT* AND FOR SUMMARY JUDGMENT**

Dated: September 28, 2010        Respectfully submitted,

                                 TEXAS INSTRUMENTS INCORPORATED,
                                 By its attorneys,

                                 Mark O. Denehy | BBO No. 120380
                                 Katharine S. Perry | BBO No. 634167
                                 Brian R. Birke | BBO No. 652720
                                 Erica M. Caron | BBO No. 664709
                                 ADLER POLLOCK & SHEEHAN P.C.
                                 175 Federal Street
                                 Boston, MA 02110
                                 T: 617.482.0600
                                 F: 617.482.0604

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………iii

I.      Introduction..……………………………………………………………...1

II.     Background……. ………………………………………………………….2

        A.     Plaintiffs' Thyroid Cancer…...…………………………………………3

        B.     Molholt's Report…………………..…………………………………...4

III.    Standard For Admissibility Of Expert Testimony……….……………………....4

IV.     Molholt Is Not Qualified To Testify As To Causation……….………………..8

V.      Molholt's Opinion Is Unreliable, Based On Flawed Data,
        Subjective Intent, And Specious Methodology, And, Therefore,
        Does Not Meet The Standards For Admissibility Under Rule 702………….......10

        A.     Molholt Failed To Follow The Scientific Method………………10

        B.     Molholt Admits That He Did Not Analyze Material Data Regarding
               Exposure And Dose………………………………...…...12

        C.     Molholt Relies Upon Faulty Data And Fails To Consider And Account
               For Contradictory Evidence……………………………15

VI.     Conclusion …..........……………………………………………………..20

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Penn. Eng'g Corp.*, 102 F.3d 194 (5th Cir. 1996) .............................................................. 12

*Allgood v. General Motors Corporation*, No. 02-1077-DFH, 2006 WL 2669337 (Hamilton,
  J.)(S.D. Ind.)............................................................................................................................ 8

*Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248 (1st Cir. 1998)........................................ 10

*Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22 (1st Cir. 2006)…………......................................8

*Cano v. Everest Minerals Corp.*, 362 F.Supp.2d 814 (W.D. Tex. 2005) ...................................... 15

*Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106 (5th Cir. 1991).................................... 7, 18

*Crowe v. Marchand*, 506 F.3d 13 (1st Cir. 2007)........................................................................ 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)................................. *passim*

*Eggar v. Burlington N. R.R.*, No. 89-159-BLG, *et al.*, 1991 WL 315487 (Battin, J.)
  (D. Mont. 1991), *aff'd*, 29 F.3d 499 (9th Cir. 1994) ................................................................. 13

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997).................................................................... 7, 17

*Grimes v. Hoffman-LaRoche, Inc.,* 907 F. Supp. 33 (D.N.H. 1995).............................................. 10

*Haemonetics Corp. v. Baxter Healthcare Corp.*, 593 F.Supp.2d 303 (D. Mass. 2009) .............. 10

*Hochen v. Bobst Group, Inc.*, 290 F.3d 446 (1st Cir. 2002).......................................................... 4

*In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litig.*,
  524 F.Supp.2d 1166 (N.D. Cal. 2007) .................................................................................... 18

*In re Hanford Nuclear Reservation Litig.*, 894 F. Supp. 1436 (E.D. Wash. 1995) ................. 7, 18

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3rd Cir. 1994),
  *cert. denied*, 513 U.S. 1190 (1995)...................................................................................... 6, 7

*In re TMI Litig.*, 193 F.3d 613 (3rd Cir. 1999) ....................................................................... 8, 13

*Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F.Supp.2d 175 (D. Conn. 2009).................... 10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)…………………………….............5, 6, 15

*LeClercq v. Lockformer Co.*, No. 00-7164, 2005 WL 1162979 (N.D. Ill. Apr. 28, 2005)........... 18

*McGovern* v. *Brigham & Women's Hospital,* 584 F.Supp.2d 418 (D. Mass. 2008) ............... 5, 10

*Milward v. Acuity Specialty Products Group, Inc.*, 664 F.Supp.2d 137
    (D. Mass. 2009)...........................................................................................................................7, 17, 18

*Norwood v. Raytheon Co.*, No. 04-127-PRM, 2009 WL 677474, (Martinez, J.)
    (W.D. Tex. March 11, 2009)...................................................................................................... 12

*O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1107 (7th Cir. 1994), *cert. denied*, 512
    U.S. 1222 (1994).......................................................................................................................... 13

*O'Connor v. Commonwealth Edison Co.*, 807 F. Supp. 1376 (C.D. Ill. 1992) ............................. 5

*Rivera Pomales v. Bridgestone Firestone, Inc.*, 217 F.R.D. 290 (D. P.R. 2003)………………..11

*Ruiz-Troche v. Pepsi-Cola of P.R. Bottling Co.*, 161 F.3d 77 (1st Cir. 1998)................................ 7

*Smith v. General Elec. Co.*, No. 91-12912-RGS, 2004 WL 870832 (Stearns, J.)
    (D. Mass. April 23, 2004) ............................................................................................................ 6

*Sutera v. The Perrier Group of America, Inc.*, 986 F.Supp. 655 (D. Mass. 1997)........... 5, 6, 8, 15

*Whiting v. Boston Edison Co.*, 891 F.Supp. 12 (D. Mass. 1995)............................. 5, 8, 12, 14, 15

*United States v. UnumProvident Corp.*, No. 03-11699-PBS, 2009 WL 530575 (Saris, J.) (D. Mass., Feb.
24, 2009)…………………………………………………………………………...5

*United States v. Hines*, 55 F.Supp.2d 62 (D. Mass. 1999)……………………………………...5

**Rules**

 Federal Rule of Evidence 702................................................................................................ *passim*

**Other Authorities**

29 Wright & Gold, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6266, Supp. 64 (1997 &
    2008 Supp.)................................................................................................................................... 10

ALTERATIONS OF THE BRAF GENE IN THYROID TUMORS, Endocr. Pathol. 16(3): 163-72 (2005)  19

ATSDR, Ionizing Radiation: Public Health Statement, http://www.atsdr.cdc.gov/phs/
    phs.asp?id=482&tid=86 (last visited September 15, 2010)...................................................... 13

Eaton, SCIENTIFIC JUDGMENT AND TOXIC TORTS: A PRIMER IN TOXICOLOGY FOR JUDGES AND LAWYERS,
    12 J.L. & Pol'y 1, 11 (2003)..……………………………………………………....12

Evaluation of Cancer Incidence in Census Tracts of Attleboro and Norton, Bristol County,
    Massachusetts, 1982 – 2002, Shpack Landfill, MAD 980503973 ........................ 15, 16, 17, 18

The Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE
    (2nd ed. 2000)…………………………………………………………………………..16

National Counsel on Radiation Protection & Measurements Report No. 159, RISK TO THE
    THYROID FROM IONIZING RADIATION (2008)………………………………………………14

National Research Council of the National Academy of Sciences Committee on the Biological Effects of
    Ionizing Radiation, Report No. III…….………………………………...................12

National Research Council of the National Academy of Sciences Committee on the Biological Effects of
    Ionizing Radiation , Report No. V….......................................….……………………….12

National Research Council of the National Academy of Sciences Committee on the Biological Effects of
    Ionizing Radiation, Report No. VII……...………………………………………….….14

President's Commission, REPORT OF THE TASK FORCE GROUP ON HEALTH PHYSICS AND
    DOSIMETRY, 36 (1979)…………………………………………………………………………..13

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2033
    (Merriam-Webster 1993)..……………………………………………………...............11

# I.  __Introduction__

Defendant Texas Instruments Incorporated ("Texas Instruments") respectfully submits this Memorandum of Law in Support of its Motion to Exclude Proffered Expert Bruce Molholt, Ph.D. ("Molholt"), under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, and for summary judgment.[1]

Plaintiffs' claims arise from Texas Instruments' alleged improper disposal of radioactive contaminants and other carcinogenic substances at the Shpack Landfill, located in the towns of Norton and Attleboro, Massachusetts ("Shpack" or the "Site"), which Plaintiffs claim are a substantial contributing cause of their thyroid cancers.  In support of their claims, Plaintiffs proffer only the testimony of Molholt, a self-described toxicologist, to conclude that Plaintiffs "developed their papillary thyroid cancers as a result of having been exposed … to radionuclides in the Shpack Landfill …."  Molholt, however, is unqualified to offer his opinions, and, more importantly (and perhaps as a result), his opinions are supported only by cherry-picked, irrelevant facts intended for pure shock value; blatant misstatements of government epidemiological figures; and insufficiently reliable facts and data.  He fails to deductively evaluate radionuclide exposure, source, or dose, and ignores actual Shpack data and the specific pathology of Plaintiffs' cancers that otherwise contradict his opinions.  Because Plaintiffs' causation claim is predicated solely upon Molholt's specious and unreliable methodology, which should be precluded from evidence under Rule 702 and *Daubert*, the Court should grant Texas Instruments summary judgment as to Plaintiffs' claims.

---

[1] This Memorandum applies equally to the action brought by Plaintiff Cheryl M. Corbett ("Corbett"), Civil Action No. 08-10904, and the action brought by Plaintiff Sandra J. Hannan's ("Hannan"), Civil Action No. 08-10905, both of which are before this Court.  Indeed, Plaintiffs' proposed expert, Molholt, in his "Expert Toxicological Report" ("Report") addresses both actions.  A copy of Molholt's Report, dated April 16, 2010, is attached as Exhibit 1.

II.     **Background**

Plaintiffs' claims focus on Texas Instruments' former operation of a manufacturing facility in Attleboro, Massachusetts that processed uranium.[2]   *See* the Complaints in the Corbett and Hannan actions, attached as <u>Exhibits 2</u> and <u>3</u>, respectively.   More specifically, Plaintiffs allege that Texas Instruments improperly disposed of radioactive contaminants and other carcinogenic substances at Shpack (an industrial and community fill), as well as burned such substances at its facility.   *See id.*   Plaintiffs claim that they were exposed to these contaminants at Shpack in a number of manners and at various times during their childhood and early adulthood. *See* Deposition of Sandra Hannan, dated December 8, 2009, at 109-175, and Deposition of Cheryl M. Corbett, dated January 20, 2010, at 77-99, attached as <u>Exhibits 4</u> and <u>5</u>, respectively. Plaintiffs allege to have grown up and lived near Shpack during the relevant time, and frequented Shpack to retrieve various discarded household and personal items.   *See* <u>Exhibits 4</u> and <u>5</u>. Because of their proximity to Shpack, Plaintiffs claim to have witnessed smoke emanating from the burning contents of Shpack.   *See* <u>Exhibits 4</u> and <u>5</u>.   They also claim to have consumed blueberries that grew in discrete areas at Shpack and to have consumed fish from and swam in a pond located near Shpack ("Chartley Pond").   *See* <u>Exhibits 4</u> and <u>5</u>.   Importantly, Plaintiffs allege exposure to contaminants only in and around Shpack – *not the M&C (or, subsequently, Texas Instruments) facility*.   *See* <u>Exhibits 4</u> and <u>5</u>.

From their alleged exposure to the contaminants at Shpack, Plaintiffs assert three claims: (I) Negligence; (II) Ultra-Hazardous Activity/Strict Liability; and (III) Willful and Wanton Misconduct.   These claims are all premised upon Plaintiffs establishing that they developed

---

[2] From the early 1950s through 1981, Texas Instruments and a predecessor entity, Metals and Controls, Inc. ("M&C"), entered into numerous contracts with the United States Atomic Energy Commission ("AEC") on behalf of the United States Navy.   M&C was issued a special nuclear materials license from the AEC to receive, possess, and use uranium enriched in the U-235 isotope.

thyroid cancer as a result of exposure to radioactive contaminants and other toxic and carcinogenic chemicals and substances.  *See* Exhibits 2 and 3.  In support of their causation claim, Plaintiffs proffer only Molholt's Report.

A.      **Plaintiffs' Thyroid Cancer**

Plaintiffs have well-developed chronic lymphocytic thyroiditis consistent with Hashimoto thyroiditis, which is an autoimmune disorder commonly found in women.  *See* Report and Opinion of Virginia A. LiVolsi, M.D. ("LiVolsi Report"), Texas Instruments' expert pathologist, attached as Exhibit 6; Report of Kenneth B. Ain, M.D. ("Ain Report"), Texas Instruments' expert thyroid oncologist, attached as Exhibit 7; Report and Opinion of Robert N. Sawyer M.D. ("Sawyer Report"), Texas Instruments' expert in occupational, environmental, and preventative medicine, attached as Exhibit 8.  It is estimated that approximately fifteen percent (15%) of peri- and postmenopausal women in the United States suffer from this disorder, which is most likely genetically-defined.  LiVolsi Report.

From this background of Hashimoto thyroiditis, Corbett has a dominant lesion of malignant lymphoma, non-Hodgkin type, with foci of incidental papillary microcarcinoma; and Hannan has a papillary thyroid carcinoma, Warthin-like variant.  *See* LiVolsi Report, Ain Report, Sawyer Report.  The etiology of these sub-types of cancer is unrelated to any known or postulated radionuclide exposure.  *See* LiVolsi Report, Ain Report, Sawyer Report.  In contrast, certain other papillary carcinomas of the thyroid have been associated with radiation exposure, but *only* when the exposure is direct and of several orders of magnitude higher than that alleged by Plaintiffs or where the exposure is accompanied by radioactive iodine intake, of which none is alleged.  *Compare* Molholt Report *with* LiVolsi Report, Ain Report, Sawyer Report.[3]

---

[3] There is no allegation or evidence that Plaintiffs were exposed to radionuclides accompanied by any radioactive iodine intake – period.

B.    **Molholt's Report**

Bruce Molholt neither is a medical doctor, a pathologist, an oncologist, nor a health physicist.  *See* Molholt Report, Appendix.  He holds a Ph.D. in microbiology and is a mathematician by training; he has no degree or certifications in toxicology.  *Id;* Deposition Transcript of Bruce Molholt, Ph.D., dated August 30, 2010, ("Molholt Deposition") attached as Exhibit 9, at 25-26.  Molholt seeks to testify with authority on his ultimate conclusion that Plaintiffs' exposure "to radionuclides in the Shpack Landfill which had been dumped there by Texas Instruments" caused their thyroid cancer.  *See* Molholt Report, 14.[4]  In doing so, Molholt presents the following flawed syllogistic reasoning based on myriad assumptions: (1) radiation can cause thyroid cancers; (2) M&C utilized enriched uranium in its operations; (3) the Shpack site contained evidence of enriched uranium; (4) Plaintiffs resided near and played in or around Shpack; (5) therefore, Plaintiffs' thyroid cancer was caused by M&C's uranium.

Molholt did not conduct an exposure, dose, or pathological or toxicological analysis.  On its face, his report is nothing more than an *ipse dixit* pronouncement.

III.   **Standard For Admissibility Of Expert Testimony**

Federal Rule of Evidence 702 "assigns to the trial judge the responsibility for ensuring that an expert's testimony as to scientific, technical, or other specialized knowledge 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 452 (1st Cir. 2002), *quoting Daubert*, 509 U.S. at 597.  Specifically, Rule 702 provides:

> [A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if *(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

[4] Molholt offers his opinions only with respect to radionuclides.  He does not offer any opinion as to Plaintiffs' exposure (or the effect of same) to any other chemicals or carcinogens alleged earlier by Plaintiffs as having caused their thyroid cancers.

Fed.R.Evid. 702 (emphasis added).

The Court's application of Rule 702, as "gate-keeper," is critically important, because, due to the difficulty of evaluating their complex testimony, expert witnesses have the potential to "be both powerful and quite misleading." *Daubert*, 509 U.S. at 595. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999); *United States v. UnumProvident Corp.*, No. 03-11699-PBS, 2009 WL 530575, *6 (Saris, J.)(D. Mass., Feb. 24, 2009); *United States v. Hines*, 55 F.Supp.2d 62, 64 (D. Mass. 1999).  That potential is heightened in toxic tort settings because a "jury may blindly accept an expert's opinion that conforms with their underlying fear of toxic substances without carefully understanding or examining the basis for the opinion." *Sutera v. The Perrier Group of America, Inc.*, 986 F.Supp. 655, 660 (D. Mass. 1997) (alternation in original), *citing Whiting v. Boston Edison Co.*, 891 F.Supp. 12, 24 (D. Mass. 1995), *quoting O'Connor v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1391 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994), *cert. denied*, 512 U.S. 1222 (1994).  Here that risk is particularly acute in light of Plaintiffs' nuclear radiation claims and Molholt's grandiose claims and innuendos, none of which pertain to Shpack or Plaintiffs' claimed exposure. *See* Molholt Report, 1-10.

As gatekeeper, this Court must first review the qualifications of Molholt – to determine "whether the opinion the proffered expert seeks to give in the case at bar is one that society – outside the litigation process – seeks from this individual …." *McGovern* v. *Brigham & Women's Hospital,* 584 F.Supp.2d 418, 424 (D. Mass. 2008), *citing Kumho Tire Co.*, 526 U.S. at 157.  Specifically, this Court considers whether, under Rule 702, the proposed expert is qualified as an expert by his "knowledge, skill, experience, training or education." *See* Fed.R.Evid. 702. A proposed expert not qualified on the *specific* subject matter of his testimony cannot testify as an expert. *See Sutera*, 986 F.Supp. at 662.

Even if Molholt is found qualified, the Court must still assess (1) whether the reasoning or methodology underlying his conclusion is scientifically valid and reliable, *i.e.*, based on methods and procedures of science rather than subjective belief or speculation; and (2) whether his reasoning or methodology can be applied to the facts in issue, *i.e.*, a nexus existing between his Report and the facts of this case.  *See Kumho Tire Co.*, 526 U.S. at 141; *Daubert*, 509 U.S. at 592-93; *Sutera*, 986 F.Supp. at 661; *Smith v. General Elec. Co.*, No. 91-12912-RGS, 2004 WL 870832, at *4 (Stearns, J.)(D. Mass. April 23, 2004).  *See Crowe v. Marchand*, 506 F.3d 13, 17 (1st Cir. 2007) (Rule 702 requires that expert testimony rest on "sufficient facts or data" and reflect the use of "reliable principles and methods" appropriate to the expert's field).

The Court's reliability and relevance determinations are made by analyzing the "principles and methodology" used by Molholt in reaching his opinions.  *See Daubert*, 509 U.S. at 592, 594-96 (scientific validity relates to "relevance" and "reliability" requirements because testimony can only assist trier of fact if it has "a valid scientific connection to the pertinent inquiry.").  Factors comprising that analysis include:

- Whether the expert's methodology has been or could have been tested;
- Whether the expert's methodology has been subject to peer review and publication;
- The known or potential rate of error for the methodology utilized;
- The existence and maintenance of standards and controls; and
- The level of acceptance of the reasoning or methodology in the relevant scientific or professional community.

*See Kumho Tire Co.*, 526 U.S. at 149-150; *Daubert*, 509 U.S. at 592-94.  Scientific reliability extends to "each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743-45 (3rd Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995).  Consequently, any step rendering Molholt's analysis unreliable infects the entirety of his Report and expected testimony.  *See id*

This court also "evaluate[s] the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Ruiz-Troche v. Pepsi-Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).  As the Supreme Court explained in *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997):

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* at 146.  Stated differently, Molholt's opinions must have adequate support in the scientific principles upon which he purports to rely – principles related to toxicology, pathology, oncology, and health physics.  *See Milward v. Acuity Specialty Products Group, Inc.*, 664 F.Supp.2d 137, 142 (D. Mass. 2009) (excluding opinion based on insufficiently reliable facts and data), *citing Ruiz-Troche*, 161 F.3d at 81.  Where Molholt failed to analyze the entirety of data, including those that adversely affect on his opinions, those opinions are undermined and inadmissible.  *See Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1115 n.13 (5th Cir. 1991) ("[E]ven if experts may generally rely on a certain source or quantum of data in the absence of contrary or more complete information, this may not suffice to admit an opinion critically resting on the former, when significantly different and more accurate or complete information is established beyond reasonable dispute in the record."), *cert. denied*, 503 U.S. 912 (1992); *In re Hanford Nuclear Reservation Litig.*, 894 F. Supp. 1436, 1449 (E.D. Wash. 1995) ("By failing to contest the objective data ... the plaintiffs may be deemed to have admitted their validity.... [T]his objective data completely undermines the plaintiffs' claim.").

Here, Molholt's underlying data *and* methodology are unreliable and based purely on a speculative, outcome-determinative analysis.  As a corollary, because Molholt's methodology is so disconnected from the facts of this case, it cannot assist a trier of fact, and is irrelevant.

Therefore, Molholt should be precluded from testifying and offering his opinions in this matter, as has been done in at least two other matters.  *See In re TMI Litig.*, 193 F.3d 613, 703-704 (3rd Cir. 1999) (excluding Molholt's radiation dose and medical causation testimony as purely subjective); *Allgood v. General Motors Corporation*, No. 02-1077-DFH, 2006 WL 2669337, **6-11 (Hamilton, J.)(S.D. Ind.) (excluding Molholt's risk assessment as unreliable due to selection bias, among other reasons).   Further, because of Molholt's preclusion, Texas Instruments should be awarded summary judgment on Plaintiffs' claims.[5]

## IV.    Molholt Is Not Qualified To Testify As To Causation

In order for Molholt to testify as an expert, Rule 702 requires that he have "'knowledge, skill, experience, training, or education' 'in the specific subject for which the testimony is offered.'"  *Sutera*, 986 F.Supp. at 661, *citing* Fed.R.Evid. 702; *Whiting*, 891 F.Supp. at 24 ("a scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle of disease.").   That specific subject matter here is Plaintiffs' purported exposure to radionuclides at Shpack and whether such exposure caused their specific sub-types of thyroid cancer.  *See* Molholt Report, 14.  Rather than retain a witness with relevant expertise in (1) studying and analyzing the nature and physical effect of the Shpack radionuclides (health physicist); (2) analyzing the adverse health effects of enriched uranium on the thyroid (radiation toxicologist); or, importantly, (3) analyzing the cause and precise nature of Plaintiffs' specific thyroid cancers and the radiation sensitivity of the thyroid (pathologist, thyroid oncologist, or

---

[5] Summary judgment is the appropriate mechanism to dismiss claims where those claims turn on precluded expert testimony.  *See Sutera*, 986 F.Supp. at 668 (granting summary judgment where plaintiff could offer no reliable scientific evidence showing a causal link between the benzene in his bottled water and his leukemia); *Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 27 (1st Cir. 2006)(affirming the grant of summary judgment where without expert testimony "the average juror will not have knowledge as to the use of a ladder jack, the construction of scaffolding out of ladders, and the combination of factors that would make such a situation safe or unsafe").

specialized medical doctor), Plaintiffs offer only Molholt, who has not done and cannot do any of the above. *See* Molholt Report, Appendix; Molholt Deposition, 25-26.

Molholt is not a board certified toxicologist, was not trained as a toxicologist, does not hold a degree in toxicology, and is not a medical doctor or health physicist. Molholt Report, Appendix; Molholt Deposition, 25-26, 59-63, 65-67, 69-69. He has no background, education, or training in health physics, medicine, or radiation health effects on the thyroid. Molholt Report, Appendix; Molholt Deposition, 25-26. Yet, while he associates himself with the broad toxicological field for the past 30 years, his actual expertise is as Ph.D. in microbiology, for which he has maintained a number of professorships. *See* Molholt Report, Appendix.

Molholt admittedly is outside of the expertise required to render opinions on exposure to radionuclides and the development of thyroid cancers. Despite his claimed 30-years of toxicological experience, Molholt has *no* peer-reviewed publications relating to radiation biology, radiation health effects pertaining to radionuclides, enriched uranium, or the thyroid. Molholt Report, Appendix; Molholt Deposition, 59-63, 65-67, 69-69. Moreover, Molholt has no published material (peer-reviewed or otherwise) relating to any diseases of the thyroid, let alone its cancers and relationship to radiation. Molholt Deposition, 68.

Notwithstanding his admittedly limited background and expertise with radionuclides and the thyroid, Molholt still seeks to testify with authority on his conclusion that Plaintiffs' alleged exposure "to radionuclides in the Shpack Landfill which had been dumped there by Texas Instruments" caused what he improperly considers their similar papillary thyroid cancer. Molholt Report, 14. *See* LiVolsi Report, Ain Report, Sawyer Report. Given that Molholt lacks the knowledge, skill, experience, training, and education that *Daubert* requires of experts to opine properly on the *specific* subject of radiation-related thyroid cancers, generally, not even

venturing into Plaintiffs' precise cancer sub-types, the Court should rule that Molholt is unqualified under Rule 702 to offer an opinion regarding proximate cause.

## V. Molholt's Opinion Is Unreliable, Based On Flawed Data, Subjective Intent, And A Specious Methodology, And, Therefore, Does Not Meet The Standards For Admissibility Under Rule 702

Plaintiffs bear the burden of establishing that the data and methodology employed by Molholt in rendering his opinion that Plaintiffs' purported exposure to radionuclides at Shpack caused their sub-type of papillary thyroid cancers is both reliable and relevant under Rule 702. *See Daubert*, 509 U.S. at 593 n.10; *Grimes v. Hoffman-LaRoche, Inc.,* 907 F. Supp. 33, 35 (D.N.H. 1995).

### A. Molholt Failed To Follow The Scientific Method

Molholt abandoned any pretense of following the scientific method in rendering his opinion, as required by Rule 702 and *Daubert*. *Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 253 (1st Cir. 1998). Compliance with the scientific method is a necessity for expert opinion to move forward in the *Daubert* analysis. *Daubert*, 509 U.S. at 590; *Haemonetics Corp. v. Baxter Healthcare Corp.*, 593 F.Supp.2d 303, 305 (D. Mass. 2009); *McGovern,* 584 F.Supp.2d at 423, *citing* 29 Wright & Gold, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6266, Supp. 64 (1997 & 2008 Supp).

The scientific method dictates that one should try to disprove through testing and analysis one's own *hypothesis* in order to develop an opinion. *Daubert*, 509 U.S. at 590, 593-94; *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F.Supp.2d 175, 190-91 (D. Conn. 2009) (precluding experts on basis that they failed to conduct "an open-minded search for the truth about … contamination" and defining scientific method as "one based on a "systematic pursuit" of knowledge through "testing and confirmation."), *citing* WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY 2033 (Merriam-Webster 1993). In contrast, Molholt testified his thought process in undertaking his expert assignment as follows:

> [T]o link potential exposures in the Attleboro/Norton, Massachusetts area to the thyroid cancers which were detected for the two plaintiffs.

> [and]

> [T]o link potential exposures of the sisters in the Shpack Landfill environment to the kinds of diseases that they were diagnosed with, eventually.

Molholt Deposition, 16, 22. Abandoning the scientific method, Molholt began with his conclusion – Plaintiffs' thyroid cancers are linked causally to radionuclides found at Shpack – and then searched for a methodology by which to buttress his pre-determined result, in the process ignoring relevant data and analyses.[6] Texas Instruments' experts, however, did analyze the issue of causation by adhering to the scientific method. *See* Expert Report of Alan Fellman, Ph.D., C.H.P. ("Fellman Report"), Texas Instruments' expert health physicist, attached as Exhibit 10; LiVolsi Report; Ain Report; Sawyer Report. They did not work backward from the conclusion. They tested the very hypothesis, or question, before the Court – whether there is sufficient evidence from which one can reliably conclude that Plaintiffs' purported exposure to radionuclides at Shpack caused their specific thyroid cancers. After analyzing the relevant data, they unequivocally opined that there is no reliable basis to conclude that Plaintiffs' thyroid

---

[6] It is noteworthy that Molholt has displayed an alliance with the plaintiff's bar, such that any semblance of impartiality and objectivity in his analysis is removed. Since 1999, Molholt has spent ninety percent (90%) of his time as a litigation consultant, "almost exclusively" for the plaintiff's bar. Molholt Deposition, 35-36, 39-40. Molholt has a clear bent to his analyses, and does not try to avoid any potential bias. This is particularly the case here, where he has shown no ability to act independently of Plaintiffs' counsel in designing his methodology and formulating his opinion. *See Rivera Pomales v. Bridgestone Firestone, Inc.*, 217 F.R.D. 290, 295 (D. P.R. 2003)(noting that "far too frequently in the current legal system the use of professional expert witnesses has become rampant. That is to say, that instead of utilizing professionals that work in a specific field to comment and give learned opinions on certain subjects, attorneys turn to "guns for hire" whose main job or means of living is generated from giving expert testimony. The Court fears that this trend will result, if it has not already resulted, in supposed experts not utilizing scientific methods to render an opinion but rather by twisting scientific methods to produce a result that will support the case of those footing the bill. The Court warns the parties that this type of witness will be scrutinized with a highly critical eye in order to preserve the sanctity of the common law legal system.").

cancers were caused by radionuclides at Shpack.  Because Molholt's opinions are not based on any scientific method, he seeks to testify not from science, but from argument.  Consequently, Molholt's testimony is not admissible under *Daubert* and Rule 702.

### B.   Molholt Admits That He Did Not Analyze Material Data Regarding Exposure And Dose

Plaintiffs are required to show by a preponderance of the evidence that the dose level of ionizing radiation that they allegedly received from Shpack was the proximate cause of their thyroid cancers.  *See Whiting*, 891 F.Supp. at 13, 25 (concerning issue of whether ionizing radiation specifically caused plaintiff's cancer).  This is due, in part, to the fact that "[c]ancers induced by radiation are indistinguishable from those occurring naturally; hence, their existence can be inferred only on the basis of a statistical excess above the natural incident."  *Id.* at 15, *quoting* National Research Council of the National Academy of Sciences Committee on the Biological Effects of Ionizing Radiation ("BEIR"), Report No. III, 137 and *citing* BEIR Report No. V, 50 (no known radiogenic cancer signature that would allow a clinical determination that a particular cancer was caused by radiation).[7]  Moreover, in ionizing radiation cases, "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."  *Norwood v. Raytheon Co.*, No. 04-127-PRM, 2009 WL 677474, (Martinez, J.)(W.D. Tex. March 11, 2009), *quoting* Eaton, SCIENTIFIC JUDGMENT AND TOXIC TORTS: A PRIMER IN TOXICOLOGY FOR JUDGES AND LAWYERS, 12 J.L. & Pol'y 1, 11 (2003) and *citing Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("[S]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiff's burden.").  *See also O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1107 (7th Cir. 1994), *cert. denied*, 512 U.S. 1222

---

[7] Additional problems "compel" resorting to statistical modeling, which include the need to account for many factors other than radiation that are known carcinogens.  BEIR Report No. V, 50 (cited by *Whiting*, 891 F.Supp. at 15 n.9).

(1994) (excluding expert as to radiation exposure on basis that no dose analysis was conducted and no personal study or experiments were performed that justify expert's observational opinions and conclusions); *Eggar v. Burlington N. R.R.*, No. 89-159-BLG, *et al.*, 1991 WL 315487, **8, 10 (Battin, J.)(D. Mont. 1991) (experts precluded due to ignoring quantifiable data as to exposure to and dosage of chemicals in the environment), *aff'd*, 29 F.3d 499 (9th Cir. 1994).  Even the Agency for Toxic Substances and Disease Registry ("ATSDR") of the U.S. Department of Health and Human Services, provides that "many factors determine whether you'll be harmed" by ionizing radiation, which "include the *dose* (how much), the *duration* (how long) …." *See* ATSDR, Ionizing Radiation: Public Health Statement,   http://www.atsdr.cdc.gov/phs/ phs.asp?id=482&tid=86 (last visited September 15, 2010) (emphasis added).

Dose analyses are relevant and required under *Daubert* for a reason.[8]  Absent dose analysis, one cannot analyze the change in effect of Plaintiffs' thyroids caused by differing levels of their purported radiation exposure, as defined temporally.  A trier of fact is left to pure speculation as to the dose-response relationship and any conclusions that can be drawn regarding causation – the very antithesis of the scientific method and what *Daubert* requires. Notwithstanding Molholt's understanding of and prior attempts to use this basic methodological tool,[9] his Report is devoid of any analysis of the radionuclide exposure to which Plaintiffs were subject and any measurement of their radiation dose.  Indeed, Molholt confirmed that he did not even attempt to conduct any type of dose analysis:

---

[8] Dose analysis or "dosimetry" is "the science of determining radiation fields and dose to individuals, or materials, by using any and all known types of detectors and calculational techniques."  *In re TMI Lit.*, 193 F.3d at 699 n.140, *citing* President's Commission, REPORT OF THE TASK FORCE GROUP ON HEALTH PHYSICS AND DOSIMETRY, 36 (1979).

[9] Molholt attempted to opine on radiation dose exposure and causation in *In re TMI Litig.*, 193 F.3d at 699, but was precluded from testifying because his "subjective methodology [was] suspect," not peer reviewed, had no known or potential rate of error, no discernible standards governing its operation, and was not generally accepted. *Id.* at 703 & 704 n.144 (noting that Molholt admitted that he "would reach into [his] bag of tricks" to manipulate his analysis so that it would reach his conclusion)(alteration in original).

Q:      Did you attempt to estimate the dose of radiation that either Ms. Corbett or Ms. Hannan received as a result of being on the Shpack Landfill?

A.      I didn't attempt a dosimetry, and I can get into that as to why, if -- if you've would like a further explanation.

Q.      You didn't try to estimate the dose, right?

A.      I did not.

Molholt Deposition, 48.[10]  Molholt's failure to conduct any dose analysis, let alone account for any exposure or dose data, is fatal to his opinion.

To the extent that Plaintiffs and Molholt rely upon a no-threshold or linear non-threshold model of causation to justify the absence of any dose analysis while attempting to reach their causation conclusion, such a methodology has been rejected by this Court.  *See Whiting*, 891 F.Supp. at 25.  This Court in *Whiting* held that an expert who lacked validating data as to his exposure and dose conclusions was left to rely on an impermissible linear non-threshold model of the causal relationship between ionizing radiation and cancer.  *Id.* at 23.  Properly characterized, the linear non-threshold model abandons the notion that there may be a point at which neutral or benign effects of a substance become harmful, *i.e.*, any exposure to radiation is harmful and causative.  *Id.*  In critiquing this model, this Court ruled as follows:

---

[10] In stark contrast, Dr. Fellman conducted a thorough analysis of the various radiation surveys conducted at Shpack, the ostensible exposure pathways and timing, and patterns of contamination to establish the radiation dose levels that Plaintiffs could have received: Hannan = 1.5 mrem/year over 41 years (based on Hannan's testimony of spending approximately 12,146 total hours at Shpack) and Corbett = 0.23mrem/year over 13 years (based on Corbett's testimony of spending approximately 600 total hours at Shpack).  *See* Fellman Report (providing explication of radionuclide measurement standards and applications).  Dr. Fellman then compares the potential dose and occupancy patterns of Plaintiffs to those of natural, background levels and epidemiological data to opine that the relative dosage of Shpack radionuclides that Plaintiffs could have received is far less than that which has indicated a minimal elevation in thyroid cancer incidence. *Id.*, *citing* BEIR, Report No. VII; National Counsel on Radiation Protection & Measurements Report No. 159, RISK TO THE THYROID FROM IONIZING RADIATION (2008); and the radiological conditions surveys of Shpack conducted by Oak Ridge National Laboratory (1981), NUS Corporation (1984), Bechtel National, Inc. (1984), DOE's Formerly Utilized Sites Remedial Action Program (1995), and Cabrera Services, Inc. (2001).  For example, the average, natural background level of radionuclides in the United States is 300 mrem/year; cigarette smokers intake an average of 30 mrem/year; home construction materials provide a dose, on average, of 7 mrem/year; the public surface water supply on average provides a dose of 1-28 mrem/year. *Id.*

> The linear non-threshold model cannot be falsified, nor can it be validated. To the extent that it has been subjected to peer review and publication, it has been rejected by the overwhelming majority of the scientific community. It has no known or potential rate of error. It is merely an hypothesis. In sum, it has no capacity to be of assistance to a jury in resolving the ultimate issues in this case.

*Id.* at 25. *See Sutera*, 986 F.Supp. at 666 (there is no scientific evidence that the linear no-safe threshold analysis is an acceptable scientific technique used by experts in determining causation in an individual instance."). *See also Cano v. Everest Minerals Corp.*, 362 F.Supp.2d 814, 836-37 (W.D. Tex. 2005) (requiring dose analysis in establishing causation of cancer by radionuclide exposure and rejecting linear non-threshold model), *citing, inter alia, Sutera*, 986 F.Supp. at 666 and *Whiting*, 891 F.Supp. at 24. Indeed, under Molholt's analysis, because radionuclides are ubiquitous as background, causation can never be established because it would be just as likely that ambient radionuclides were the cause of Plaintiffs' thyroid cancers. Consequently, any use by Molholt of the linear non-threshold model to derive causation conclusions is unacceptably speculative and cannot be tested, except, of course, by Molholt – it is the *ipse dixit* pronouncement that the Supreme Court in *Daubert* and *Kumho Tire Co.* sought to bar.

   C.    **Molholt Relies Upon Faulty Data And Fails To Consider And Account For Contradictory Evidence**

   In addition to ignoring Plaintiffs' exposure and dose, Molholt misrepresents epidemiological data relating to Shpack radionuclides and thyroid cancer. *See* Molholt Report, 3-14. Molholt relies principally upon a report prepared by the Massachusetts Department of Public Health, entitled EVALUATION OF CANCER INCIDENCE IN CENSUS TRACTS OF ATTLEBORO AND NORTON, BRISTOL COUNTY, MASSACHUSETTS, 1982 – 2002, SHPACK LANDFILL, MAD 980503973 ("MA Public Health Report"), attached as <u>Exhibit 11</u>. From the MA Public Health Report, Molholt opines that "[t]he incidence of thyroid cancer in Attleboro is elevated above the

background rate with 95% statistical significance." Molholt Report, 10.[11]   What Molholt does

not consider or, rather, admit, is that thyroid cancer was statistically elevated only for *males* and

*during 1988 – 1993 only* (7 diagnoses versus 2.6 expected).   MA Public Health Report, 21, 43-44

("The increase in the incidence of thyroid cancer among males during this time period cannot be

explained by an increase in any one area of the city.").   This finding is irrelevant to Plaintiffs'

specific causation claim.   What is relevant is the MA Public Health Report finding that thyroid

cancer incidence for females in all years either was insignificantly elevated statistically or

actually was below expected levels.   *Id.*[12]

---

[11]  The Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2nd ed. 2000) defines statistical significance and confidence interval as follows:

> Statistical significance.   ….   [A] statistically significant result is unlikely to be the result of random sampling error and justifies rejection of the null hypothesis. ….

> Confidence interval.   A range of values calculated from the results of a study within which the true value is likely to fall; the width of the interval reflects random error.   …   The width of the confidence interval provides an indication of the precision of the point estimate or relative risk found in the study; the narrower the confidence interval, the greater the confidence in the relative risk estimate found in the study.   Where the confidence interval contains a relative risk of 1.0, the results of the study are not statistically significant.

*Id.* at 389, 396.

[12]  Thyroid Cancer Incidence – Attleboro, MA [* denotes statistical significance]

| Period | Observed | Expected | Standardized Incidence Ratio | 95% Confidence Interval |
|---|---|---|---|---|
| 1982-1987 | 3 | 4.8 | -- | -- |
| 1988-1993 | 5 | 6.9 | 72 | 23 – 168 |
| 1994-1999 | 11 | 10.9 | 101 | 50 – 180 |
| 2000-2002 | 10 | 9.4 | 107 | 51 – 197 |

Thyroid Cancer Incidence – Norton, MA [* denotes statistical significance]

| Period | Observed | Expected | Standardized Incidence Ratio | 95% Confidence Interval |
|---|---|---|---|---|
| 1982-1987 | 1 | 1.8 | -- | -- |
| 1988-1993 | 2 | 2.5 | -- | -- |
| 1994-1999 | 3 | 4.4 | -- | -- |
| 2000-2002 | 7 | 4.0 | 177 | 71 – 365 |

*See* MA Public Health Report, 114-117; 166-169.

Undaunted, Molholt reasons that, while there are no statistically significant elevations of thyroid cancer in females, "the female cohort was … higher than expected" and, therefore, relied upon such information on the basis that statistical significance "takes a high number to achieve, as you may appreciate, 95 percent statistical significant."  Molholt Deposition, 95-99.  Aside from being wrong on the increased incidence in thyroid cancer in the female cohort, Molholt impermissibly relied upon this statistically insignificant data and drew conclusions that even the authors of the MA Public Health Report did not and could not.  *See* MA Public Health Report, 47-54 (for example, the MA Public Health Report concluded that "[n]o apparent concentrations of any specific cancer type were observed in the vicinity of the Shpack Landfill" and that its findings do "not indicate an atypical pattern of any one cancer type in either Attleboro or Norton").   In contrast to Molholt's methodology, only sound and statistically significant data may confirm a hypothesis of causation.  *See Joiner*, 522 U.S. at 145-46 (statistical significance, the Court recognized, is a means by which an expert's opinion is "connected to existing data," as opposed to being a mere "*ipse dixit*" opinion); *Milward*, 664 F.Supp.2d at 149 (absent statistically significant evidence, an opinion is merely a suggestion that may give rise to an insufficient, plausible hypothesis).  This is the case even if a particular study or report can be interpreted to suggest a positive association; the findings still must be statistically significant.  *Milward* at 148-49.  Other than his misrepresented data from the MA Public Health Report, Molholt can point to no other epidemiological (or even anecdotal) data that suggest reliably a causal relationship between the radionuclides at Shpack and Plaintiffs' thyroid cancers.

Moreover, and in addition to irrelevant anecdotes and assumptions, Molholt ignores the following relevant and contradictory data: (1) ground water had not been contaminated with radionuclides, Molholt Deposition, 50-51; (2) absence of radionuclide contamination data as to

Chartley Pond and organic materials at or near Shpack, such as blueberries and fish, *id.* at 51-52, 123-124; (3) Corbett never swam in or ate fish from Chartley Pond, *id.* at 121-123; (4) cigarette smoking is a risk factor in thyroid cancer and that Corbett smoked ½ of a pack of cigarettes per day from the age of 18 – 40, *id.* at 52[13]; (5) absence of data that radionuclides at Shpack originated from Texas Instruments, *id.* at 82; (6) Texas Instruments did not burn any material (radionuclide or otherwise) at Shpack, *id.* at 83; (7) Plaintiffs were not exposed to radionuclides at the M&C facility, *id.* at 87; (8) absence of data that radionuclides were present in the smoke from burned fill at Shpack, *id.* at 88-91; and (9) absence of data that radioactive iodine (I-131) existed at Shpack and Plaintiffs were exposed to same.   Molholt Deposition, 91-92.   Molholt's self-selected data approach is not a scientifically acceptable method, for obvious reasons relating to the veracity and the verifiability of his results.   *Milward*, 664 F.Supp.2d at 142; *Christophersen*, 939 F.2d at 1115 n.13; *In re Hanford Nuclear Reservation Litig.*, 894 F. Supp. at 1449.   *See In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litig.*, 524 F.Supp.2d 1166, 1176, 1184 (N.D. Cal. 2007) (expert witnesses barred because they cherry-picked observational studies and ignored the weight of the evidence that contradicted their conclusions); *LeClercq v. Lockformer Co.*, No. 00-7164, 2005 WL 1162979, *4 (N.D. Ill. Apr. 28, 2005) (expert witness barred because of "cherry-picking the facts he considered to render his opinion, and such selective use of facts fails to satisfy the scientific method and *Daubert*").

Importantly, Molholt also fundamentally misconstrues the various carcinogenic effects of radiation on the thyroid and the nature of Plaintiffs' specific cancers in order to apply his linear non-threshold model.   First, while Molholt admittedly is not a pathologist, he cites to Nikiforov, *et al.*, ALTERATIONS OF THE BRAF GENE IN THYROID TUMORS, Endocr. Pathol. 16(3): 163-72

---

[13] Notably, the MA Public Health Report determined that a "[r]eview of the available risk factor information suggests that tobacco use played an important role in the incidence of a number of cancers diagnosed among the residents." *Id.* at 54.

(2005) for the proposition that Hannan's cancer has the "precise pathological definition" that is associated with radiation exposure. Molholt Report, 12. Molholt, however, does not venture any further with his "pathological definition" conclusion, for example, to explain the biological mechanisms that purportedly are affected by radiation. *Compare id. with* LiVolsi Report[14]; Ain Report[15], 3; Sawyer Report[16], 3-4. Regardless, the very excerpt of the Nikiforov article Molholt cites contradicts his associative extrapolation – BRAF activation for mutation "has strong association with classical papillary carcinoma and tall cell and *possibly* Warthin-like variants" – Hannan's variant. Nikiforov, 163-172 (emphasis added). Indeed, the medical literature is replete with data of a relationship between radiation and papillary carcinoma of the thyroid, generally, but such data *does not* address Hannan's specific Warthin-like variant. *See* LiVolsi Report. This is because, distinct from Hannan's variant, other papillary thyroid cancers resulting from radiation are attributable to the relative intake of iodine and radioactive isotopes of I-131 iodine. Ain Report, 3; Sawyer Report, 3-4. *See* LiVolsi Report (noting, of the 2,000 cases of tumors pathologically examined by the Pathology Panel of the Chernobyl Tissue Bank, dealing with iodine and iodine radionuclides, Warthin-like variant comprised fewer than 10 cases, or 0.5%). There neither is data nor an allegation that I-131 was present at Shpack. Molholt Deposition, 91-92.

Molholt simply attempts no such analysis with Corbett's thyroid cancer. Instead, he inaccurately characterizes it as papillary – not primarily malignant lymphoma, non-Hodgkin type

---

[14] As a point of reference, since 1998, Dr. Livolsi has been a representative to the Pathology Panel of the Chernobyl Tissue Bank, an international body that reviews pathologic slides from the thyroid tumors that have arisen in individuals exposed to radiation at the time of the Chernobyl nuclear incident. LiVolsi Report. In the preceding four years, Dr. LiVolsi was the chair of that Panel, she now is an advisor the Panel. *Id.*

[15] Dr. Ain has engaged in decades of practice, study, and research regarding thyroid cancers, and operates one of the largest academic clinical thyroid cancer practices in North America. Ain Report, 1-2.

[16] Dr. Sawyer has specialized in environmental and preventative medicine for approximately the past 40 years, with numerous faculty and committee appointments related to the biologic aspects of environmental contamination.

– so as to fall within his "analysis" of Hannan's papillary thyroid cancer.   As Dr. LiVolsi properly opines, Corbett's cancer is of the lymphoid cells – not epithelial, it is not carcinoma such as Hannan's papillary cancer.  LiVolsi Report.  Had he reviewed the available data, Molholt would have learned there is *no* data that specific chemicals or radiation are involved in the development of thyroid malignant *lymphoma*, *non-Hodgkin type*, with the settings presented by Corbett.  LiVolsi Report; Ain Report, 3.  Similarly, there is no data that specifically indicates that chemical or radiation exposure is etiologically related to the development of her incidental papillary microcarcinoma.  The reports of Texas Instruments' medical doctors (LiVolsi, Ain, Sawyer) analyzed data that Molholt did not, and establish what Molholt cannot.

## VI.   <u>Conclusion</u>

Molholt did not even begin to engage in any scientific examination of the data before he arrived at his conclusion.   Only subsequent to forming his conclusion, did he search for supporting data.   Finding none, he speculated, assumed, and inferred – turning the scientific method, the *sine qua non* of *Daubert* admissibility, on its head.   On this basis alone, the Court should exercise its gatekeeper function under *Daubert* and exclude Molholt.   A further examination of Molholt's methodology reveals the absence of any necessary dose reconstruction or dose analysis, seemingly in favor of an unacceptable theory based on zero threshold causation.  Even here, however, Molholt failed to support his unconventional theory in any methodological manner by analyzing the biological aspects of the effect of radiation on Plaintiffs' specific sub-types of thyroid cancer and the contradictory data that calls his conclusion into question.  Simply, nothing Molholt did even approximates the methodologies called for in *Daubert* and its progeny or Rule 702.  What Molholt presents is not reliable or relevant science, but argument based on logical fallacies.   Consequently, he should be precluded from testifying pursuant to

Rule 702 and *Daubert*.  Because Plaintiffs' causation claim is predicated solely upon Molholt's

specious methodology barred under *Daubert*, the Court should grant Texas Instruments summary

judgment as to Plaintiffs' claims.

Respectfully submitted,

TEXAS INSTRUMENTS INCORPORATED,
By its attorneys,


Dated: September 28, 2010

/s/ Katharine S. Perry
Mark O. Denehy | BBO No. 120380
Katharine S. Perry | BBO No. 634167
Brian R. Birke | BBO No. 652720
Erica M. Caron | BBO No. 664709
ADLER POLLOCK & SHEEHAN P.C.
175 Federal Street
Boston, MA 02110-2890
T: 617.482.0600
F: 617.482.0604
E: mdenehy@apslaw.com
E: kperry@apslaw.com
E: bbirke@apslaw.com
E: emecler@apslaw.com

---

**CERTIFICATE OF SERVICE**

I, Katharine S. Perry, hereby certify that this document filed through the ECF system will be served electronically to the registered participants as identified on the Notice of Electronic Filing [NEF] and paper copies will be served via First-Class U.S. Mail to those indicated as non-registered participants on September 28, 2010.

/s/  Katharine S. Perry
Katharine S. Perry

---